KANAWHA COUNTY CIRCUIT COURT
CHARLESTON, WEST VIRGINIA

2018 MAR 16 P 3:55

CASE NUMBER 18-C-383

JULIA E. BLACKWOOD
1503 Hunter Drive
Charleston, WV 25311

Plaintiff,

JUDGE Webster

vs.

BERRY DUNN, LLC
Corporation Service Company
209 W. Washington St.,
Charleston, WV 25302,

NICOLE Y. BECNEL,
16 Cactus Lane,
Hurricane, WV 25526, and

JANE DOE(S)

Defendants.

## COMPLAINT

For her complaint, the Plaintiff Julia E. Blackwood ("Ms. Blackwood") states as follows:

1. Ms. Blackwood was previously employed by the Defendant Berry Dunn, LLC ("Berry Dunn").

2. Ms. Blackwood was born on September 30, 1971 and as of March 16, 2017, Ms. Blackwood was 45 years old.

3. On or about March 16, 2017, Berry Dunn wrongfully terminated Blackwood from her employment on false claims of sleeping on the job as a pretext for her dismissal for



EXHIBIT A

reasons of her age in violation of well settled public public policy in West Virginia which prohibits termination from employment on the basis of the employee's age.

4. At all relevant times, Ms. Blackwood was employed by Berry Dunn as a Senior Consultant.

5. Prior to the wheels being set in motion for her wrongful, Ms. Blackwood received satisfactory or better employee performance evaluations from the Barry Dunn project managers or project supervisory personnel with whom Ms. Blackwood worked as a Senior Consultant on various client projects awarded Berry Dunn.

6. During her initial employment, Ms. Blackwood responsibilities with raising her children prevented her from requesting job assignments requiring overnight or extended travel.

7. With her youngest son reaching adolescence, in early 2017, Ms. Blackwood made it known to her project managers at Berry Dunn she was available to accept and desired project assignments assisting the project managers assigned to the larger more lucrative client projects that often required extensive overnight travel as much as 50% of the time.

8. Ms. Blackwood sought these assignments as they provided greater opportunities for increased wages from the performance and travel bonuses paid and increased opportunity for advancements.

9. At all relevant times, Ms. Becnel was Charleston's Berry Dunn Manager and the Charleston manager responsible for assigning projects to project managers and the senior consultants.

10. Ms. Blackwood was encouraged by the project managers to set up a meeting with Ms. Becnel to formally discuss her desire to obtain these appointments by the project managers assigned to the project and familiar with her performance and hard work ethic.

11. When Ms. Blackwood was able to discuss the assignments with Ms. Becnel, Ms. Becnel would direct her back to the project managers.

12. Ms. Blackwood soon realized the lucrative Senior Consultant assignments were being assigned by Ms. Becnel at private informal meetings informally arranged by Ms. Becnel behind closed doors (where official policy was open door management) where attendance was limited to Ms. Becnel's close personal friends and confidants within the office.

13. Inasmuch as these meetings were informal and attended at the quiet invitation of Ms. Becnel and held behind closed doors (in an office with an official open-door management policy), Ms. Blackwood would first became aware of the assignment of the more lucrative projects after they had been assigned to the Senior Consultants in the exclusive group of close personal friends and confidants of Ms. Becnel often referred to by other employees in the office as the "Mean Girls."

14. Ms. Blackwood took the step of informing one of Ms. Becnel's closest friends and Mean Girl member that she wanted to meet with Ms. Becnel to discuss her (Ms. Blackwood's) future contract assignments.

15. Ms. Becnel did not meet with Ms. Blackwood as requested.

16. Prior to her hiring by Berry Dunn as a Senior Consultant, Ms. Blackwood worked for Berry Dunn as a contract employee.

17. During her work for Berry Dunn as a contract employee, Ms. Blackwood was advised a complaint regarding her had been received that she had fallen asleep at a July 2015 from Berry Dunn's largest customer in the State of West Virginia, the State of West Virginia.

18. No person was specifically identified as making the complaint, however, at the time, one of the West Virginia employees at this meeting was at the same time seeking employment with Berry Dunn as a Senior Consultant when Ms. Blackwood was also seeking

a change in her status with Berry Dunn from a contract employee to full time employee and Senior Consultant.

19. Ms. Blackwood was not informed of the source of the complaint and informed Berry Dunn there was no reason that she would have fallen asleep during the meeting as she was not fatigued.

20. The claimed sleeping incident notwithstanding, Ms. Blackwood was later offered and accepted full-time employment with Berry Dunn as a Senior Consultant on February 25, 2016 with her employment to start on April 5, 2016.

21. Ms. Blackwood subsequently requested information on the hours she had worked and allocation of her time between non-billable time and time Berry Dunn billed the State of West Virginia for the time spent by Ms. Blackwood on the Berry Dunn's consulting contracts with the State of West Virginia Ms. Blackwood had worked.

22. Ms. Blackwood reported to Berry Dunn she was concerned she might have made a coding error on her time sheet and unbillable time may have been billed to the State of West Virginia.

23. Ms. Blackwood requested this information to verify she had not incorrectly coded certain of her non-billable time to be billed in error to the State of West Virginia.

24. Ms. Blackwood was instructed by Berry Dunn not to worry about any billing error as it did not matter.

25. Ms. Blackwood was further informed she would not be able to confirm whether or not her non-billable time had been over or under billed the State of West Virginia.

26. It was further explained to Ms. Blackwood the hours Berry Dunn's consultants record in a given time period are submitted to a Berry Dunn manager who allocates the hours recorded by the Berry Dunn consultants on one State consulting contract to an unrelated State contract(s) as necessary for Berry Dunn to avoid a financial loss on any single State contract.

27. Ms. Blackwood did not understand how time billed could be transferred from one State contract and charged to an unrelated contract without the unrelated contract being charged for unrelated work eventually becoming fully charged out prior to its completion.

28. It was then explained to Ms. Blackwood Berry Dunn routinely pads each State of West Virginia consulting project/contract with ten percent additional consulting hours than determined necessary by Berry Dunn to complete a specific State consulting project/contract.

29. It was around the same time period Ms. Blackwood became increasingly aware of information being discussed in the office regarding the lavish spending by Ms. Becnel on intimate dinners and events she privately hosted for the State employee assigned with oversight responsibility on the Berry Dunn State consulting contracts and approval of contract payments billed by Berry Dunn.

30. On information and belief subsequent to Ms. Blackwood's initiation of questions regarding Berry Dunn's state contract billing practices, Ms. Becnel, rather than meeting with Ms. Blackwood to discuss her future contract assignments as Ms. Blackwood requested, initiated an internal campaign of discrimination, intentional harassment, invasion of privacy and defamation of Ms. Blackwood.

31. On March 16, 2017, Ms. Becknel met with Ms. Blackwood and informed her employment with Berry Dunn had been terminated on the pretextual and wholly concocted claim Ms. Blackwood had fallen asleep on the job on three separate occasions as an employee of Berry Dunn.

32. In connection with Ms. Becnel efforts to create a pretextual basis for the termination of Ms. Blackwood's Berry Dunn employment, on information and belief, Ms. Becnel discussed Ms. Blackwood's confidential employment information with certain members of the Mean Girls group.

33. Ms. Blackwood was not aware Ms. Becnel was plotting a campaign of defamation of Ms. Blackwood's job performance with certain members of the Mean Girls whose loyalty and confidence had been secured with their appointments as Senior Consultants on the most lucrative of Berry Dunn's consulting contracts.

34. On information and belief, Ms. Becnel enlisted certain of the Mean Girls directed them to secretly observe Julie and report back if Julie did fall asleep at work.

35. On information and belief Ms. Becnel violated Ms. Blackwood's right to privacy in directing certain Mean Girl members (the unknown Jane Doe Defendant(s)) to secretly take photos of Ms. Blackwood sleeping at work.

36. On information and belief, having failed in their effort to find Ms. Blackwood sleeping on the job, on a single occasion, certain members of the Mean Girls (the unknown Jane Doe defendant(s)) secretly photographed Ms. Blackwood when she briefly closed her eyes while on her personal lunch break.

37. Ms. Blackwood was not aware she had been secretly photographed while on the Berry Dunn premises.

38. Ms. Blackwood was never asked by Berry Dunn to consent to her photo being taken at any time.

39. If such consent had been requested, Ms. Blackwood would have refused.

40. Ms. Blackwood had no reason to expect her photo would ever be taken by Berry Dunn without her consent.

41. The unwarranted invasion of Ms. Blackwood's privacy is additionally reprehensible because the photo's were taken when Ms. Blackwood was on her own time which she was allowed for breaks and a lunch period.

42. On the next day following Ms. Blackwood being informed her employment was being terminated, Ms. Blackwood received an email date March 17, 2017 from Berry

Dunn's Director of Human Resources, Debra Genender, (office located in Portland, ME), which in relevant part, stated:

> "You are being given 3 week's severance, so you will see 8 hours for yesterday, your accrued vacation time (55 hours) and 3 weeks of severance that will all be paid in the final check."

43. With this email, Ms. Genender included an attachment in which Berry Dunn detailed the final paycheck Ms. Blackwood would receive from Berry Dunn on March 31, 2017.

44. The email attachment revealed a calculation by Berry Dunn of the three weeks severance payment Ms. Blackwood was unconditionally promised she was "being given" by Berry Dunn in the amount of $4,038.46.

45. Ms. Blackwood relied on this promised payment in making purchases and committing to making other payments in the approximate amount of the severance payment she was "being given" by Berry Dunn without condition.

46. Upon learning Ms. Blackwood had retained counsel in connection with her termination from employment, Berry Dunn refused to pay Ms. Blackwood was promised by Berry Dunn she was "being given" without condition.

47. Berry Dunn informed Ms. Blackwood it would not pay the severance payment unconditionally promised unless she signed a severance agreement releasing Berry Dunn from any and all claims and placing unduly restrictive conditions on her finding other employment.

48. At the time Berry Dunn refused to pay Ms. Blackwood the severance payment she had been unconditionally promised she was "being given" by Berry Dunn, Berry Dunn and Ms. Becnel were completely advised Ms. Blackwood was the primary wage earner for her family and her termination from employment would cause substantial financial hardship on Ms. Blackwood.

49. In placing conditions on their unconditional promise of payment, Berry Dunn and Ms. Becnel intentionally and or negligently caused Ms. Blackwood substantial emotional distress accompanied by physical injury.

50. Berry Dunn attempted to leverage Ms. Blackwood's financial and emotional distress to force Ms. Blackwood to release her legitimate claims against Berry Dunn for unlawful termination from employment; breach of promise; breach of contract and breach of the related claim breach of the covenant of good faith; defamation; unlawful invasion of privacy; harassment; intentional and/or negligent infliction of emotional distress (Ms. Blackwood was not yet aware of the unlawful invasion of her privacy at the time Berry Dunn first conditioned payment of the unconditionally promised severance payment on her signing a severance agreement).

51. Berry Dunn attempted to leverage Ms. Blackwood's financial and emotional distress to force Ms. Blackwood to release her lawful claims against Ms. Becnel for unlawful termination of her employment; aiding and abetting; intentional and/or negligent infliction of emotional distress; defamation; and unlawful invasion of privacy.

52. Berry Dunn attempted to leverage Ms. Blackwood's financial and emotional distress to force Ms. Blackwood to release her lawful claims against unknown defendants Jane Doe(s) for defamation, aiding and abetting, intentional and/or negligent infliction of emotional distress and unlawful invasion of privacy.

53. Ms. Blackwood was not aware she had been defamed by Ms. Becnel and Berry Dunn and her right of privacy had been violated by Ms. Becnel, Berry Dunn and the unknown Jane Doe defendants until a letter dated May 2, 2017 was received by Ms. Blackwood's counsel from Berry Dunn's counsel which included 2 photos of Ms. Blackwood during her personal lunch break taken by unknown defendant(s) Jane Doe(s).

54. A second letter from Berry Dunn's counsel dated May 5, 2017 was received by Ms. Blackwood's counsel in which Berry Dunn's counsel made the following statement on behalf of Berry Dunn with regard to the Blackwood photos:

> Because we will be required to defend the claims, the pictures showing that Ms. Blackwood fell asleep while working will end up as evidence in the public record of this case. Quite frankly, I am not sure why anyone looking for a job would want pictures of herself sleeping on the job in the public record, taking the risk that the media covering the case will find them and report on them. It seems to me that it would be in Ms. Blackwood's interest to execute the separation agreement that she has been offered, so both parties can move forward.

55. Berry Dunn attempted to leverage the threat of publication of the unconsented photos taken of Ms. Blackwood with the known negative consequences such publication would have on Ms. Blackwood's efforts to secure new employment in forcing Ms. Blackwood to sign a severance agreement releasing all her claims against the named defendants and the unknown Jane Doe(s) defendant(s).

## PRAYER FOR RELIEF

Wherefore, Ms. Blackwood requests a jury trial of the matters set forth herein; and prays for an award of compensatory and other allowed damages as determined by the Jury against (1) Berry Dunn for violations of West Virginia's Wage Payment and Collection Act for late payment of amounts paid and failure to pay all amounts due Ms. Blackwood; (2) Monetary Damages in the approximate amount of $1,000,000 and determination of joint and/or several liability against the named defendants and the unknown Jane Doe(s) defendant(s) on Ms. Blackwood's claims for (a) Wrongful Termination of Employment; (b) Unlawful Invasion of Privacy; (b) Breach of Promise; (c) Detrimental Reliance; (d) Breach of Contract and breach of the related covenant of good faith and fair dealing; (e) Intentional Infliction of Emotional Distress with accompanying physical injury; (f) Negligent Infliction of Emotional Distress; and (g) Aiding and Abetting.

Ms. Blackwood further prays for an award of punitive damages against all named defendants and the unknown Jane Doe(s) Defendant(s) as determined by the jury on her claims of (a) Wrongful Termination of Employment; (b) Unlawful Invasion of Privacy; (b) Breach of Promise; (c) Detrimental Reliance; (d) Breach of Contract and breach of the related covenant of good faith and fair dealing; (e) Intentional Infliction of Emotional Distress with accompanying physical injury; (f) Negligent Infliction of Emotional Distress; and (e) Aiding and Abetting.

Respectfully filed this 16ʰ Day of March, 2018

*/s/ Michael D. Weikle*

Michael D. Weikle (West Virginia Bar No. 4982)
51 Gibson Court Tiffin, OH 4883
mikeweikle@weiklelaw.com
734-358-1876

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

Julia Blackwood
_____
Plaintiff

v.                                   Civil Action No. 18-C-834

Berry Dunn, LLC
Nicole Becnel
_____
Defendant.

**FILED**
2018 JUL 13 A 11:33
CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

---

**NOTICE AND ACKNOWLEDGMENT
OF RECEIPT OF SUMMONS AND COMPLAINT BY 1ST CLASS MAIL**

TO: Nicole Becnel
16 Cactus Ln
Hurricane, WV 25326

I, hereby certify that I have this 13th day of JUN, 2018, mailed a copy of the within summons and complaint in an envelope properly addressed and stamped by first class mail to Nicole Becnel 16 Cactus Ln, Hurricane WV 25326

C Atkins
Deputy Clerk

The enclosed summons and complaint are served pursuant to Rule 4(d)(1)( c) of the West Virginia Rules of Civil Procedure.

You must complete the acknowledgment part of this form and return one copy of the completed form to the Office of the Clerk of the Circuit Court of Kanawha County within 20 days.

You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

If you do not complete and return the form to the Office of the Clerk of the Circuit Court of Kanawha County within 20 days, you (or the party on whose behalf you are being served) may be required to pay any expenses incurred in serving a summons and complaint in any other manner permitted by law.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within 20 days. If you fail to do so, judgment be default will be taken against you for the relief demanded in the complaint.

I declare that this Notice of Acknowledgment of Receipt of Summons and Complaint was mailed on JUN 13, 2018

**Cathy S. Gatson, Clerk**
Cathy S. Gatson, Clerk
Kanawha County Circuit Court

By: C Atkins
Deputy Clerk

7/13/18
Date of Signature

CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

JULIA E. WEIKLE
1503 HUNTERS DRIVE
CHARLESTON, WV 25311 Plaintiff

Case No. 18-C-3

FILED
CA
2018 JUL 13 A 11: 33
CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

v.

BERRY DUNN LLC
(209) CHARLESTON SERVICE COMPANY (STATUTORY AGENT)
209 W. WASHINGTON ST.
CHARLESTON, WV 2503 Defendant

## SUMMONS

To the above-named Defendant:

IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and required to serve upon Michael D. Weikle (WVSB 4982) plaintiff's attorney, whose address is 51 Gibson Court, Tiffin, OH 44883 an answer, including any related counterclaim you may have, to the complaint filed against you in the above styled civil action, a true copy of which is herewith delivered to you. You are required to serve your answer within 21 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint and you will be thereafter barred for asserting in another action any claim you may have which must be asserted by counterclaim in the above styled civil action.

Dated: 7/13/18

Cathy S. Gatson, Clerk
Clerk of Court

By: CAtkins
Deputy Clerk